**Slip Op. 05-85**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CORUS STAAL BV**,<br><br>       Plaintiff,<br><br> v.<br><br>**UNITED STATES**,<br><br>       Defendant,<br><br> and<br><br>**UNITED STATES STEEL CORPORATION**,<br><br>       Defendant-Intervenor. | **Before: Jane A. Restani, Chief Judge**<br><br>**Court No. 04-00316** |

## <u>OPINION</u>

[Results of final administrative review of antidumping duty order on hot-rolled steel from the Netherlands sustained.]

Dated: July 19, 2005

Steptoe & Johnson LLP (<u>Richard O. Cunningham</u>, <u>Joel D. Kaufman</u>, <u>Alice A. Kipel</u>, and <u>Troy H. Cribb</u>) for plaintiff.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Jeanne E. Davidson</u>, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Claudia Burke</u>), <u>Amanda Blaurock</u>, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (<u>John J. Mangan</u>) for defendant-intervenor.

Restani, Chief Judge:  This matter is before the court on the plaintiff Corus Staal BV's

("Corus") motion for judgment on the agency record pursuant to United States Court of International

Trade Rule 56.2. At issue are the final results of the first administrative review of an antidumping

duty order by the International Trade Administration of the United States Department of Commerce

("Commerce" or "Department") of hot-rolled steel from the Netherlands. See Certain Hot-Rolled

Carbon Steel Flat Products from the Netherlands, 69 Fed. Reg. 33,630 (Dep't Commerce June 16,

2004) (final admin. rev.), as amended by, 69 Fed. Reg. 43,801 (Dep't Commerce July 22, 2004) (am.

final admin. rev.) [hereinafter Final Results].

Corus claims (1) that the agency's use of a "zeroing" methodology is contrary to law, and

(2) that its use of the date of entry (instead of the date of sale) for selection of certain export price

("EP") transactions is both contrary to law and unsupported by substantial evidence. Corus claims

that zeroing, whereby "negative dumping margins," viz, where the U.S. price is higher than the

normal value ("NV"), are set to zero in calculating Corus's weighted average dumping margin (and

concomitant assessment rate) do not properly allow non-dumped sales to offset dumped sales,

introducing an "improper statistical bias into the calculation." Pl.'s Br. at 2. Corus further claims

that this court and the Court of Appeals for the Federal Circuit have held that zeroing is not required

by statute, and, therefore, this court may only uphold Commerce's methodology if it is reasonable,

which Corus asserts it no longer is, given the WTO Antidumping Agreement, see Pub. L. No. 103-

465, 108 Stat. 4809 (1994), and recent WTO decisions.[1]

---

[1] See, e.g., United States – Final Dumping Determination on Softwood Lumber from Canada, WT/DS264/AB/R, 2004 WTO DS LEXIS 18 (Aug. 11, 2004, adopted Aug. 31, 2004) (appellate body report) ("Softwood Lumber"); United States – Sunset Review of Anti-Dumping Duties on Corrosion-resistant Carbon Steel Flat Products from Japan, WT/DS244/AB/R, 2003 WTO DS LEXIS 218 (Dec. 15, 2003, adopted Jan. 9, 2004) (appellate body report) ("Corrosion-resistant Steel"); European Communities – Anti-Dumping Duties on Imports of Cotton-Type Bed Linen from India, WT/DS141/AB/R, 2001 WTO DS LEXIS 13 (Mar. 1, 2001, adopted Mar. 12, 2001) (appellate body report)

(continued...)

In addition, Corus argues that Commerce erred legally and factually by using the date of entry to select certain EP transactions for review, which it asserts is inconsistent with its use of the date of sale for other EP transactions and all constructed export price ("CEP") sales. Because, allegedly, Commerce offered no reasonable explanation for basing its review in some instances on the date of sale and in others on the date of entry, and offered no explanation for deviating from its prior and exclusive use of the date of sale as a selection criterion in its preliminary results,[2] Corus asks the court to enter an order remanding this administrative review to Commerce. Corus also asks this court to instruct Commerce, on remand, (1) to re-calculate Corus's dumping margin, cash deposit rate, and assessment rate without resort to zeroing; (2) to use, exclusively, the date of sale to select the transactions to be reviewed during the period of review ("POR") (instead of date of sale for CEP transactions and a combination of date of sale and date of entry for EP transactions); and (3) to refund the amount of estimated antidumping duty deposits collected in excess of the lawful amount.

In response to plaintiff's motion, both the defendant ("Government" or "Commerce"), and the United States Steel Corporation ("U.S. Steel"), the defendant-intervenor, argue that Corus's motion, with respect to zeroing, should be denied because the final results are in accordance with law. Commerce, citing decisions by this court and the Federal Circuit, which have both repeatedly sustained Commerce's methodology, asserts: (1) zeroing is a "reasonable" interpretation of an ambiguous statutory provision regarding dumping margins and weighted average dumping margins,

---

(...continued)
    ("EC-Bed Linen").

    [2] See Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands, 68 Fed. Reg. 68,341 (Dep't Commerce Dec. 8, 2003) (prelim. admin. rev.) [hereinafter Prelim. Results].

see 19 U.S.C. § 1677(35) (2000); and (2) the WTO reports cited by Corus are legally irrelevant, for numerous reasons. U.S. Steel agrees with Commerce that the Department's use of zeroing was proper, and that Corus's reliance on WTO decisions is misplaced, but also asserts that zeroing is not merely in accordance with law but that its use is actually required by law.

As for the second issue, regarding Commerce's classification of certain U.S. sales as EP sales, Commerce and U.S. Steel disagree. Commerce asks the court to remand the issue to Commerce to re-classify certain EP transactions; U.S. Steel requests that the plaintiff's motion, in all respects, be denied. U.S. Steel asserts that Corus mischaracterized certain sales (those made to its just-in-time ("JIT") customers) as EP sales, and argues that any sales made after importation must, according to the statutory terms, see 19 U.S.C. § 1677a(a)–(b) (2000), be CEP sales. U.S. Steel further argues that the Department properly utilized its standard methodology of using the date of sale during the POR for CEP sales (and for EP-classified sales made after importation, such as CEP sales normally are), and of using the date of entry for ordinary EP sales. As explained below, the court concludes that remand is not appropriate and the final results of the administrative review are sustained.

## PROCEDURAL HISTORY

This appeal arises out of the first administrative review of an antidumping duty order regarding hot-rolled steel from the Netherlands. U.S. Steel, a domestic producer of hot-rolled steel, and a defendant-intervenor in these proceedings, was both a petitioner in the investigation that resulted in Commerce's antidumping duty order and an active participant in the administrative proceedings below. Corus, the plaintiff, is a producer of hot-rolled steel in the Netherlands and brought this appeal to challenge two aspects of the final results that pertain to the calculation

methodology Commerce used to determine the 4.80% weighted average dumping margin applicable to Corus: (1) zeroing; and (2) the change in selection criterion from date of sale, to date of sale for all CEP transactions and certain EP transactions and date of entry for the remaining post-importation EP sales. See Final Results, 69 Fed. Reg. at 33,631 and accompanying Issues & Decision Mem. [hereinafter "Issues Mem. to Steel from the Netherlands"], at cmts. 4, 10, as amended by, 69 Fed. Reg. at 43,802.

On November 29, 2001, Commerce published the antidumping duty order on certain hot-rolled carbon steel flat products from the Netherlands. See Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands, 66 Fed. Reg. 59,565 (Dep't Commerce Nov. 29, 2001) (antidumping duty order). On November 1, 2002, Commerce published notice of the opportunity to request an administrative review of certain hot-rolled carbon steel flat products from the Netherlands, covering the period from May 3, 2001, to October 31, 2002. See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 67 Fed. Reg. 66,612 (Dep't Commerce Nov. 1, 2002) (opportunity to req. admin. rev.).

On November 26 and 27, 2002,[3] a group of U.S. steel companies, including U.S. Steel, pursuant to 19 C.F.R. 351.213(b)(1) (2004),[4] requested that Commerce, in accordance with 19 U.S.C. § 1675 (2000),[5] conduct an administrative review of Corus's sales of the subject

---

[3] Nucor Corporation filed its request for administrative review on November 26, 2002; Bethlehem Steel Corporation, National Steel Corporation, and U.S. Steel filed their request on November 27, 2002. Prelim. Results, 68 Fed. Reg. at 68,342 n.1.

[4] Allowing domestic interested parties to request an administrative review of an antidumping or countervailing duty order each year during the anniversary month of the order's publication.

[5] Providing for periodic review of duty order amount, at least once during each 12-month
(continued...)

merchandise. On December 26, 2002, Commerce published a notice of initiation of this antidumping duty administrative review, covering the period from May 3, 2001, through October 31, 2002. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 67 Fed. Reg. 78,772 (Dep't Commerce Dec. 26, 2002). On January 9, 2003, Commerce issued its antidumping duty questionnaire to Corus—an ongoing question and response process that lasted from then until May 19, 2003, when Corus responded to Commerce's third supplemental questionnaire. See Prelim. Results, 68 Fed. Reg. at 68,342. Commerce then verified Corus's submitted data and requested Corus to report entered value data. See id. Also, as a result of the court's decision in Corus Staal BV v. United States, 283 F. Supp. 2d 1357, 1358 (Ct. Int'l Trade 2003), the Department will not assess duties on subject merchandise that entered between October, 30, 2001, and November 28, 2001, inclusive. See also Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands, 68 Fed. Reg. 60,912, 60,912 (Dep't Commerce Oct. 24, 2003) (final ct. decision & suspension of liquidation).

On December 8, 2003, Commerce published its preliminary results from the administrative review of the antidumping duty order on hot-rolled steel from the Netherlands. See Prelim. Results, 68 Fed. Reg. at 68,341. After issuance of these preliminary results, the Department invited comments; and in response, Corus, U.S. Steel, and Nucor filed case briefs on January 14, 2004, and submitted rebuttal briefs on January 23, 2004. See Final Results, 69 Fed. Reg. at 33,630. After

---

[5](...continued)
period, beginning on the anniversary of the date of publication of the antidumping duty order, if a request for such a review has been received.

Corus timely-filed a ministerial error allegation, in accordance with 19 C.F.R. 351.224(c)(2) (2004),[6] the Department revised its antidumping duty margin for Corus, decreasing it from the original 4.94% assessment to the currently contested 4.80% ad valorem. See Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands, 69 Fed. Reg. 43,801, 43,801–02 (Dep't Commerce July 22, 2004) (am. final admin. rev.). Corus timely commenced this action under 19 U.S.C. § 1516a(a)(2)(A)(i),[7] (B)(iii)[8] (2000), and 28 U.S.C. § 1581(c) (2000).

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c). The court, in reviewing one of Commerce's administrative determinations, will uphold the challenged determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.      Commerce's Request For Remand Is Denied

Prior to oral argument, the court denied Commerce's request for a remand. The request was both unsupported and unexplained. With respect to the classification of sales as EP or CEP, Commerce simply stated that "[u]pon further review . . . certain transactions were mistakenly classified as EP transactions." Resp. Br. at 26.

---

[6] Setting five days as the time limit for submitting comments regarding ministerial errors.

[7] Allowing review of administrative determinations on the record within thirty days of the date of publication in the Federal Register.

[8] Defining reviewable determinations to include final determinations by the "administering authority" (Commerce) or the "Commission" (International Trade Commission) under 19 U.S.C. § 1675.

In SKF USA, Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001), the Court of Appeals addressed the issue of a voluntary remand when Commerce's original determination, denying a favorable adjustment to the plaintiff-appellant, was not required by statute. After initially determining, during the administrative review, that the loss incurred on the sale of a subsidiary should be included in the plaintiff's general and administrative ("G&A") expense calculation, Commerce, on appeal before the Court of International Trade, "reversed course," and instead of defending its final results, sought a remand, arguing, in accordance with the plaintiff's position, that the loss should no longer be included in the G&A expense calculation. Id. at 1026.

Obviously, this case differs from SKF because Commerce's remand request is not so that it may bestow a benefit on the party paying duties. Here, the request is in response to defendant-intervenor U.S. Steel's brief, which claims a misclassification—"because these so-called EP sales did not meet the statutory definition of EP," (see Def.-Intervenor's Br. at 25–26)—although U.S. Steel admits it missed the time for filing suit to change the classification. Nonetheless, SKF may be instructive because the court explained that an agency may seek a remand (1) to reconsider its decision because of intervening events outside of the agency's control; (2) to reconsider its previous position even if there are no intervening events; or (3) because it believes that its original decision was incorrect on the merits and it wishes to change the result. 254 F.3d at 1028–29.

The first situation does not apply to this case.

With respect to the second situation, the Federal Circuit explained that an agency may "simply state that it had doubts about the correctness of its decision or that decision's relationship to the agency's other policies." Id. at 1029. In that situation, the reviewing court has discretion over whether to remand, and may refuse a remand if the agency's request is "frivolous or in bad faith."

Id. But, "if the agency's concern is substantial and legitimate, a remand is usually appropriate." Id. Here, there does not appear to be any substantial or legitimate administrative concern warranting a remand. Commerce's stated reason for requesting a remand was simply "to correct this classification so that its written position is consistent with the factual record." Def.'s Resp. Br. at 26. Commerce articulated no other policy issue or view, nor did it otherwise express any doubts about the correctness of its decision in relation to the agency's other policies.

With respect to the third situation, the court held that a "[r]emand to an agency is generally appropriate to correct simple errors, such as clerical errors, transcription errors, or erroneous calculations." SKF, 254 F.3d at 1029. The court explained that "[a]lthough a court need not necessarily grant such a remand request, remand may conserve judicial resources, or the agency's views on the statutory question, though not dispositive, may be useful to the reviewing court." Id.

Here, a remand would not seem to preserve judicial resources or permit application of Commerce's views on a statutory question. See Corus Staal BV v. United States, 259 F. Supp. 2d 1253, 1257 (Ct. Int'l Trade 2003) ("Corus Staal I") ("[C]oncerns for finality do exist and the agency must state its reasons for requesting remand. Further, if only to guard against the 'bad faith' requests of concern to the court in SKF, the court must be apprised of the reason for the remand request, whether it be on account of error or merely a change in policy.").

While there was a vague reason given here, which exceeds the information provided in the earlier Corus Staal I case, this was still insufficiently informative. There is no real evidence that Commerce erred. While the EP sales at issue appear were invoiced after importation, a hallmark of CEP sales, the statute does permit, inter alia, "post-importation" EP sales where the sale is pre-negotiated. See 19 U.S.C. § 1677a(a) ("The term 'export price' means the price at which the subject

merchandise is first sold (or agreed to be sold) before the date of importation . . . ."). Thus, if an error did occur, Commerce needed to explain it in detail.

Furthermore, U.S. Steel avers that reclassifying the sales from EP to CEP would have an insignificant effect on the dumping margin, and it does not seek this relief. Accordingly, if the court has discretion over whether to grant this remand request, the court exercises such discretion to deny this request for remand, which likely would simply delay this matter for no substantial reason.

The court is concerned that Commerce is taking some broad language in the SKF decision, the holding of which may apply to a very narrow group of cases, out of context, simply to avoid dealing with difficult methodological issues. In this case, Commerce did not even brief the issue of the proper date for selection of EP and CEP sales, relying instead on its unsupported request for remand to delay the day of reckoning. This was a disservice to the court, as the court must resolve this issue. The interests of both plaintiffs and defendants depend on the prompt and orderly resolution of these matters, which Congress clearly intended.[9] The Government must give due regard to finality and cannot simply ask for a do-over any time it wishes.

---

[9] Reflecting the need for expedition in these matters, United States Court of International Trade Rule 3(g) provides for the precedence of unfair trade cases over most other actions, and the statute contains a series of time limitations on Commerce's actions. See USCIT Rule 3(g) (listing an action contesting a determination in a countervailing or antidumping duty proceeding third in order of precedence, following only an action seeking injunctive relief and an action involving the exclusion or redelivery of perishable merchandise); 19 U.S.C. § 1675(a)(3)(A) (requiring, if practicable, "[t]he administrating authority [to] make a preliminary determination [in a review as to the amount of any antidumping duty] within 245 days after the last day of the month in which occurs the anniversary of the date of publication of the order, finding, or suspension agreement for which the review . . . is requested, and a final determination . . . within 120 days after the date on which the preliminary determination is published.").

## II.    Commerce's Use Of Zeroing Is Reasonable And In Accordance With Law

As Corus noted in its brief, numerous cases before this court and the Federal Circuit have held that "zeroing" is neither required nor prohibited by the U.S. statute, see 19 U.S.C. § 1677(35)(A),[10] (B),[11] in either an investigation, see, e.g., Corus Staal I, 259 F. Supp. 2d at 1261, or an administrative review, see, e.g., Timken Co. v. United States, 354 F.3d 1334, 1341–42 (Fed. Cir.), cert. denied, 125 S. Ct. 412 (2004) ("Timken").

Despite these prior holdings, Corus argues that fundamental structural changes to the U.S. Antidumping statute, as implemented in the Uruguay Round Agreements Act ("URAA"), render zeroing inherently unreasonable, citing recent WTO decisions for further support that zeroing is no longer reasonable. See supra note 1. The Federal Circuit, however, in addressing arguments similar to the ones Corus now presents before the court, (1) expressly affirmed the reasonableness of Commerce's use of zeroing in an antidumping administrative review, and (2) accorded no deference to Corus's cited WTO cases, again concluding that WTO decisions are not binding on the U.S. and cannot trump domestic legislation. See Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1346–49 (Fed. Cir. 2005) ("Corus Staal II") (holding that (1) "[o]ur decision in Timken addressed Commerce's interpretation of section 1677(35);" and (2) "[w]e give Commerce substantial deference in its administration of the statute because of the foreign policy implications of a dumping

---

[10] 19 U.S.C. § 1677(35)(A). The statute states: "The term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." (emphasis added).

[11] 19 U.S.C. § 1677(35)(B). The statute states: "The term 'weighted average dumping margin' is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." (emphasis added).

determination"). While it is highly debatable whether the intricacies of margin calculation involve foreign policy, the Government's response to WTO decisions vary; and, as the Federal Circuit noted, a court should "not attempt to perform duties that fall within the exclusive province of the political branches." Id. at 1349. Because decisions by the Federal Circuit are binding on this court, Corus's arguments regarding the reasonableness of zeroing, therefore, must fail.

Corus's final argument was also addressed by the Federal Circuit in Corus Staal II; however, Corus now relies on changed facts. Specifically, Corus attempts to capitalize on the Federal Circuit's caveat in Corus Staal II: "[W]e . . . refuse to overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme." Id. (emphasis added). Corus argues that the WTO's Softwood Lumber decision, which prohibited the use of zeroing in calculating dumping margins under the weighted-average-to-weighted-average methodology, has been "adopted pursuant to the specified statutory scheme," and therefore, the court should rule zeroing no longer reasonable, not based on the WTO ruling itself, but on Commerce's re-interpretation of its policy in the wake of the adverse Softwood Lumber ruling.

Before any agency regulation or practice can be modified to conform to an adverse WTO ruling, Commerce must follow the particular statutory scheme Congress enacted. See id. This process mandates consultation between the various political branches of the Executive and Congress "to determine whether or not to implement WTO reports and determinations and, if so implemented, the extent of implementation." Id.; see also 19 U.S.C. §§ 3533(f)–(g), 3538 (2000).[12]

_____

[12] These steps include: (1) consultation between the U.S. Trade Representative ("USTR"), agency, relevant congressional committees, and the private sector; (2) notice and
                                                                                                    (continued...)

Corus submits that the "critical steps" had already been taken by the time of the Federal Circuit's decision in Corus Staal II.[13]  In Corus Staal II, the Federal Circuit was quite clear that it "reject[ed] Softwood Lumber as nonbinding because the finding therein was not adopted as per Congress's statutory scheme."  395 F.3d at 1349.  Therefore, until all of the statutorily mandated procedures have been fully complied with, it matters not whether the "critical steps" have already been taken.  Since the Federal Circuit issued its opinion in Corus Staal II, Commerce has subsequently issued both its preliminary and final determinations to implement Softwood Lumber. See Notice of Determination Under Section 129 of the Uruguay Round Agreements Act: Antidumping Measures on Certain Softwood Lumber Products from Canada, Pl.'s Addendum 1 (Apr. 15, 2005) ("Sec. 129 Determ.").  Corus stresses that the determination has been forwarded to the USTR, but Commerce correctly notes that the USTR still must direct the Department to implement the determination, "in whole or in part."  Sec. 129 Determ. at 1, 38.  See 19 U.S.C. § 3538(b)(4).[14] Thus, the statutorily mandated procedure is incomplete.

---

(...continued)
comment; (3) publication of the modification and its explanation in the Federal Register; and (4) further consultation between the USTR, agency, and relevant congressional committees regarding implementation of the new determination.

[13] Corus identifies the "critical steps" as (1) U.S. notification to the WTO that it would implement the Softwood Lumber decision, (2) consultation with Commerce and Congress, and (3) instruction by the USTR directing Commerce to draft a section 129 determination implementing Softwood Lumber.  Pl.'s Reply Br. at 3 n.2.

[14] 19 U.S.C. § 3538(b)(4) states that "[t]he Trade Representative may, after consulting with the administering authority and the congressional committees . . . , direct the administering authority to implement, in whole or in part, the determination . . . ." (showing that even after a final determination, the USTR need not instruct Commerce to implement it) (emphasis added).

Even if the USTR had directed the Department to implement the determination in full, it still would not be applicable to this case.[15] Unlike a section 123 proceeding, which concerns implementation of panel reports regarding a WTO member's general practices, a section 129 report only affects the implementation of the specific investigation at issue, in this case softwood lumber from Canada. Compare URAA § 123, 19 U.S.C. § 3533, with URAA § 129, 19 U.S.C. § 3538.[16] Moreover, the WTO Appellate Body's report in Softwood Lumber made clear that the only issue before it was zeroing "as applied" in that case to Canadian lumber: "no methodology, as such, has been challenged." Softwood Lumber, WT/DS264/AB/R at ¶ 63 (emphases in original). Further, even if the general methodology were at issue, section 129(c)(1) of the URAA, 19 U.S.C. § 3538(c)(1), explicitly provides that any section 129 redetermination by Commerce will only affect the unliquidated entries of subject merchandise that "are entered, or withdrawn from warehouse, for consumption on or after . . . the date on which the Trade Representative directs the administering authority . . . to implement that determination." 19 U.S.C. § 3538(c)(1)(A) (emphasis added). In its section 129 determination, Commerce notes that the "SAA clearly provides, 'such [section 129] determinations have prospective effect only.'" URAA Statement of Administrative Action,

---

[15] On April 27, 2005, in accordance with sections 129(b)(4) and 129(c)(1)(B) of the URAA, 19 U.S.C. § 3538(b)(4), (c)(1)(B), the USTR, after consulting with Commerce and Congress, directed the Department to implement the determination. See Antidumping Measures on Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 22,636 (Dep't Commerce May 2, 2005) (final determ. under sec. 129 of URAA) [hereinafter Final Section 129 Determination].

[16] Section 123(f)(3) discusses generally "whether to implement the [WTO] report's recommendation" and section 123(g)(1) regards "[c]hanges in agency regulations or practice." 19 U.S.C. § 3533(f)(3), (g)(1). Section 129, in contrast, discusses everything in terms of "particular proceedings," from the initial agency action, to the re-determination, to the implementation of the re-determination. 19 U.S.C. § 3538.

accompanying H.R. Rep. No. 103-316, at 1026 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4313 ("SAA"); Sec. 129 Determ. at 4; Final Sec. 129 Determ., 70 Fed. Reg. at 22,637.

Lastly, even Commerce's section 129 determination implementing Softwood Lumber limits the effect of the adverse WTO ruling. In the redetermination, Commerce changed its methodology from using a weighted-average-to-weighted-average methodology, which was the subject of the "as applied" challenge in Softwood Lumber, to using an individual-to-individual transaction methodology. See Sec. 129 Determ. at 6, Final Sec. 129 Determ., 70 Fed. Reg. at 22,637. Commerce's change, however, is "not inconsistent with the findings of the panel or the Appellate Body," see 19 U.S.C. § 3538(b)(2), because the individual-to-individual methodology, as the WTO Appellate Body noted, was not addressed by its Softwood Lumber ruling. Softwood Lumber, WT/DS264/AB/R at ¶ 63. Underscoring the specificity of this change, Commerce noted that by switching its methodology it was "not intending to implement an approach that applies to all antidumping investigations." Sec. 129 Determ. at 12; Final Sec. 129 Determ., 70 Fed. Reg. at 22,639. Even with respect to the Softwood Lumber investigation, and despite employing the changed methodology, Commerce still used zeroing. In its redetermination, Commerce stated that because the WTO ruling "requires the offset for non-dumped sales [i.e., does not allow zeroing] only for a weighted-average-to-weighted-average comparison, we have not applied the offset for non-dumped sales [i.e., we have used zeroing] in our transaction-to-transaction comparison." Id. Therefore, even if the USTR directs Commerce to implement the process in one case, the overall process has not changed.

In sum, the WTO decision-making process operates apart from the decision-making in this court. WTO decision-making starts with an international agreement, which may not match the

domestic statute and which is interpreted pursuant to different principles. From there, the process follows an entirely separate implementation scheme. Had the Government appeared here saying it had lost in the WTO, with respect to this very administrative determination, and it had complied with the entire statutory framework, to the effect that it was reversing its position, even as to a past determination, then the court would have to consider what to do. This, however, has not happened, and the court is bound by circuit precedent upholding zeroing.

**III.    Commerce's Change In Methodology For Selecting The Sales Used In The Margin Calculation Is Reasonable And In Accordance With Law**

Corus's database consists of two categories of U.S. sales: constructed export price sales, which were made through Corus's U.S. affiliate, and export price sales, which were made by Corus.[17] In the Preliminary Results, Commerce selected the U.S. sales to be included in the margin calculation, regardless of whether the sale was CEP or EP, on the basis of whether the date of sale was within the POR. This meant that certain EP sales—those with a date of sale prior to the POR but with an entry date during the POR—were excluded from the margin calculation.

Prior to the Final Results, U.S. Steel argued in its case brief that the date of sale methodology used to select U.S. sales was incorrect, as applied to Corus's EP sales. In support, U.S. Steel showed that, consistent with Commerce's antidumping questionnaire, Commerce's normal practice was to

---

[17] "'[E]xport price' means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)." 19 U.S.C. § 1677a(a) (emphasis added).

"'[C]onstructed export price' means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)." Id. at § 1677a(b) (emphasis added).

use date of sale for CEP sales and date of entry for EP sales. See Commerce's Antidumping Duty Questionnaire (Jan. 9, 2003), at C-1, P.R. Doc. 207, Def.-Intervenor's App., Tab 1, at 2 ("Report each U.S. sale of merchandise entered for consumption during the POR, except: (1) for EP sales, if you do not know the entry dates, report each transaction involving merchandise shipped during the POR; and (2) for CEP sales made after importation, report each transaction that has a date of sale within the POR."). EP sales, which by statute must take place prior to importation (i.e., date of entry) normally can be tied to entries during the period. CEP sales, on the other hand, which may take place following importation, are often difficult or impossible to tie to specific entries.

In response, Corus argued that the sales-based approach used in the Preliminary Results should be applied to all of its sales to ensure no transactions escape review because: (1) date of sale corresponds to its audited financial records and its use would require no end-of-period reconciliations, and (2) given the length of time between entry date and date of sale for the JIT inventory sales, there likely would be entries sold from JIT inventory that would not be invoiced until after the conclusion of the review period and, thus, too late to be captured by the review; and under Commerce's entry date methodology, such sales would never be reported because they could not be included in any subsequent review. See Corus's Reply Br., (Jan. 23, 2004), at 7–9, P.R. Doc. 80, Pl.'s App., Tab 3, at 4–6; see also Issues Mem. to Steel from the Netherlands, at cmt. 10.

In the final results, Commerce rejected Corus's position. Commerce stated that

> We agree with petitioners. In accordance with the Department's normal practice, for those sales which occurred prior to importation, we have used the date of entry to select those transactions used in our analysis. This methodology comports with the Department's standard administrative review questionnaire, which instructs respondents to report such sales of merchandise which entered for consumption during the POR. This methodology is also consistent with that used in other antidumping duty administrative reviews. Thus, for these final results, we have

amended our margin calculation program so that for sales which occurred prior to importation, the entry date was used to define those sales used in our analysis.

Issues Mem. To Steel from the Netherlands (June 16, 2004), at cmt. 10, P.R. Doc. 398, Def.-Intervenor's App., Tab 6, at 4 (citation omitted). In implementing its decision, Commerce did the following: (1) for sales classified as CEP, it continued to use the date of sale; (2) for sales classified as EP, where the sale took place prior to importation, it used the date of entry; and (3) for sales classified as EP, but where the invoice date (and hence the shipment date and presumed date of sale) took place after importation, it used the date of sale.

> **A.** **Commerce Properly Used Its Normal Method For Corus's CEP And Pre-Importation EP Sales**

Corus argues that Commerce should have used the date of sale methodology for all of its sales. Corus further argues that Commerce may not use different bases (which it refers to as "hybrid") in the same administrative review to select the sales to be analyzed. U.S. Steel disagrees.

The statute does not specify whether Commerce should use the date of entry or the date of sale as the basis on which to select transactions for review. See Helmerich & Payne, Inc. v. United States, 22 CIT 928, 933, 24 F. Supp. 2d 304, 310 (1998) ("[T]he statute is silent with respect to the universe of sales to be used in calculating dumping margins . . . ."). Commerce has adopted a regulation, however, that gives it the flexibility to use date of sale, date of export, or date of entry, as appropriate. The regulation provides that

> [f]or requests received during the first anniversary month after publication of an order . . . an administrative review under this section will cover, as appropriate, entries, exports, or sales during the period from the date of suspension of liquidation . . . to the end of the month immediately preceding the first anniversary month.

19 C.F.R. § 351.213(e)(1)(ii) (emphasis added).

Commerce's general preference is to use entries during the POR as the basis for selecting the

U.S. sales to be analyzed.  In Certain Welded Carbon Steel Pipes and Tubes from Thailand, 63 Fed.

Reg. 55,578, 55,589 (Dep't Commerce Oct. 16, 1998) (final admin. rev.), for example, Commerce

analyzed all U.S. sales that entered during the POR, stating that

> [a]lthough the Department's regulations at section 352.213(e) provide some flexibility
> in this issue, the Department's preference is to review sales based on entry dates
> unless there are compelling circumstances that warrant a different approach to
> determining the universe of sales to be examined during a particular review.

Id. at cmt. 9.  Similarly, in Issues & Decision Memorandum to Certain Corrosion-Resistant Carbon

Steel Flat Products from Canada, 70 Fed. Reg. 13,458 (Dep't Commerce Mar. 21, 2005) (final admin.

rev.), the Department explained that

> [w]e note that in section 751(a)(2)(A) of the Act [19 U.S.C. § 1675(a)(2)(A)], a
> dumping calculation should be performed for each entry during the POR.  While
> section 351.213(e) of the Department's regulations does give the Department some
> flexibility in this regard by stating that the review can be based on entries, exports, or
> sales, it is our preference to base the review on entries where possible.  In this case,
> we find no compelling reason to move away from our standard practice of using
> entries to determine the universe of U.S. sales to be reported for EP sales.

Id. at cmt. 5.  See also Helmerich, 22 CIT at 935–36, 24 F. Supp. 2d at 311 (quoting Commerce as

stating that its "usual practice in export price situations is to review and assess duties on entries

within the POR, regardless of whether the sales occurred prior to the review period").  Therefore,

Commerce's review of the EP sales in this case, based on the date of entry, is in accordance with its

standard methodology.

Furthermore, the court has upheld Commerce's entry-based methodology as reasonable.  In

Helmerich, the court upheld Commerce's use of the date of entry as a selection criterion, even though

the merchandise that entered during the POR came from a foreign trade zone and had been sold to

the customer before the POR and before the antidumping duty order had been entered. 22 CIT at 928,

938–39, 24 F. Supp. 2d at 306, 313–14.  The court explained that the entry-based approach resulted in a more accurate measure of dumping and ensured that all relevant sales were considered.  Id. at 937–38, 24 F. Supp. 2d at 313.

Although Commerce's general preference is to use the date of entry, it often uses the date of sale as the selection criterion for CEP sales.  This is because, in many CEP situations, the sale is made after importation and it is often difficult or impossible to tie entries to sales.  See id. at 938 n.9, 24 F. Supp. 2d at 313 ("In certain situations such as CEP situations where Commerce cannot tie entries to future sales, or when the Department cannot ascertain entry dates, Commerce cannot calculate margins based on sales linked to entries.  Therefore, Commerce may resort to the less accurate approach of calculating margins based on possibly unlinked sales during the POR."); see also Dynamic Random Access Memory Semiconductors of One Magabit or Above from the Republic of Korea, 66 Fed. Reg. 30,688, 30,692 (Dep't Commerce June 7, 2001) (prelim. admin. rev.) (using sales made during the POR to calculate the weighted-average dumping margins for CEP transactions).  This approach has been upheld as reasonable.

In NSK Ltd. v. United States, 17 CIT 590, 594–95, 825 F. Supp. 315, 320 (1993), for example, the court upheld Commerce's decision to examine exporter's sales price ("ESP") transactions (now CEP transactions under the URAA) on the basis of sales made during the POR. In holding, inter alia, that Commerce's review of all CEP sales made during the POR, rather than review of only the subject merchandise entered and sold during the review period, was reasonable and in accordance with the law, the court noted Commerce's reasoning with respect to these CEP sales:  (1) there is usually a lag time between entry and sale, (2) entry data is often unavailable, (3) a dumping margin cannot be determined without a sale, (4) dumping on sales made during the POR

is representative of dumping on entries made during the POR, and (5) review of sales, which can cover many entries of merchandise, can eliminate the need for conducting multiple reviews of the same information. Id. at 595, 24 F. Supp. 2d at 320; see also Ad Hoc Comm. of S. Cal. Producers of Gray Portland Cement v. United States, 19 CIT 1398, 1407, 914 F. Supp. 535, 544 (1995) (upholding Commerce's use of sales, rather than entries, during the POR to calculate a dumping margin as selection criterion for CEP sales). Therefore, Commerce's use of the date of sale as a selection criterion for Corus's CEP sales is in accordance with its standard procedure and is reasonable.

Corus relies on Hynix Semiconductor, Inc. v. United States, 248 F. Supp. 2d 1297 (Ct. Int'l Trade 2003), to argue that Commerce's "hybrid" methodology—using date of entry to select those EP transactions where the sale had occurred prior to importation, but using date of sale to select all other EP and all CEP transactions—is unreasonable.[18] In Hynix, the court sustained Commerce's decision to use the date of sale as the selection criterion for CEP sales at issue. Id. at 1303–04. The court found that Commerce properly abandoned the method used in the preliminary results, where it had calculated the dumping margin by using the CEP sales made during the POR, plus CEP entries made during the period (which were sold after the POR). Id. at 1300. The court explained that

---

[18] Corus also relies on Hynix to argue that Commerce should have continued to use the same approach to be consistent with its Preliminary Results. Although the Hynix court did recognize the value of being consistent across administrative reviews, see 248 F. Supp. 2d at 1304 (noting that Hynix involved the sixth administrative review), the review here, in contrast, is only the first administrative review of Corus's sales and hence, there is no prior review with which to be consistent. See Helmerich, 22 CIT at 937 n.8, 24 F. Supp. 2d at 313 ("In contrast [to Portable Electric Typewriters from Japan, 56 Fed. Reg. 56,393, 56,393 (Dep't Commerce Nov. 4, 1991), which was a review covering the periods May 1, 1988, through April 30, 1989, and May 1, 1989, through April 30, 1990, for an antidumping duty order entered in May 1980], this case deals with a first administrative review. Therefore, Commerce was not constrained to utilize a sales-based approach to remain consistent.").

"nothing in Commerce's regulations supports the use of a hybrid sales plus POR-entries approach for calculating dumping margins." Id. at 1304. This case is different. Here, Commerce did not use such a "hybrid" approach; it used two distinct approaches—sales during the POR for CEP transactions and entries during the POR for pre-importation EP transactions—both of which were previously upheld as reasonable.

Furthermore, in Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 63 Fed. Reg. 39,071, 39,072 (July 21,1998) (am. final admin. rev.), Commerce followed this approach, reviewing all CEP sales with a sale date during the POR and all EP sales with an entry date during the POR.

Therefore, Commerce's use of the date of entry to select Corus's pre-importation EP sales, and the date of sale to select Corus's CEP sales is reasonable and in accordance with its prior practice. Thus, as to these two categories, there is no error.

**B.      Commerce's Use Of Sales Date To Select Corus's "Post-Importation" EP Sales Was Proper**

Corus also argues that Commerce's methodology was improper because Commerce reviewed Corus's pre-importation EP sales differently from its "post-importation" EP sales.

Commerce did use the date of sale to select those EP-classified sales that Corus invoiced after importation. Yet, as discussed above, the statute defines EP sales as those transactions occurring "before the date of importation" while CEP sales may occur "before or after the date of importation." See supra note 17. Thus, because the EP sales at issue could not be treated in the same manner as the other EP sales, Commerce treated them as it treated CEP sales—by reviewing them according to date of sale, because the same matching difficulties that exist for post-importation CEP sales also exist for "post-importation" EP sales, as both sides admitted at oral argument.

Corus argues that because the only parties to these "post-importation" EP sales were Corus and the particular U.S. customer (not a U.S. affiliate), and because Corus maintained its own U.S. inventory and invoicing, the sales, were in fact, properly classified as EP sales and should have been selected on the same basis as other EP sales.[19] In AK Steel Corp. v. United States, 226 F.3d 1361, 1369–70 (Fed. Cir. 2000), the Federal Circuit examined the definitions of EP and CEP and noted that the two factors dispositive of the choice between the two classifications are (1) whether the sale takes place inside or outside the United States, and (2) whether it is made by an affiliate. Referring to the CEP definition, the court then defined the term "seller" as "one who contracts to sell" and the term "sold" as the "transfer of ownership or title." Id. at 1371.

First, with respect to the location factor, it is undisputed that the invoicing took place in the U.S. after importation, which, as indicated, presents the same entry-sale disconnect normally associated with CEP sales. With respect to the second factor, the record shows that Corus uses a U.S.-based entity to facilitate these sales. This is particularly so in reference to the JIT inventory that Corus maintains in the U.S. for certain customers. Corus's U.S.-based affiliate, Corus Steel USA Inc. ("CSUSA") serves as a "facilitator, communications link and processor of certain documentation for [Corus's] U.S. imports and sales. CSUSA never takes title to, takes possession of, or resells Corus' steel and does not possess negotiating authority over steel manufactured by [Corus]." See Corus Resp. to Commerce Antidumping Duty Questionnaire (Jan. 30, 2003), at A-16, P.R. Doc. 13, Pl.'s App., Tab 7, at 3.

---

[19] Corus also argues that because the sales were "agreed to" in the Netherlands before importation, they were EP sales. The definitions of both CEP and EP include the phrase "first sold (or agreed to be sold)." 19 U.S.C. § 1677a(a), (b).

Although CSUSA neither takes ownership of the steel nor becomes involved in the contracting process, it appears that these sales could not be executed without CSUSA. Thus, because these sales (1) were at least finalized in the U.S. post-importation, and (2) were "facilitated" by a U.S.-based affiliate, it was understandable that Commerce selected them using the same basis that it used to select CEP sales..

Finally, Corus could point to no distortion caused by this manner of selection. Commerce, while not treating the sales as CEP sales for other purposes, selected the "post-importation" EP sales for review based on a CEP sales date methodology because such sales had earmarks of CEP sales and posed the same difficulty when trying to connect them to earlier entry dates. Therefore, Commerce's selection of Corus's "post-importation" EP sales on the same basis as its CEP sales is reasonable.

## CONCLUSION

Because Commerce's use of zeroing, and its methodology for selecting sales used in the margin calculation are reasonable and in accordance with the law, Corus's Motion for Judgment on the Agency Record is denied, and Commerce's Final Results are sustained.

                                                          /s/ Jane A. Restani
                                                          Jane A. Restani
                                                          CHIEF JUDGE

Dated: New York, New York
      This 19th day of July, 2005