SLIP OP. 06-112

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CORUS STAAL BV, | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | Before: Jane A. Restani, Chief Judge |
| UNITED STATES, | : | Court No. 05-00354 |
| Defendant, | : | |
| and | : | |
| UNITED STATES STEEL CORPORATION , | : | |
| Defendant-Intervenor | : | |

OPINION

[Plaintiff's motion for judgment upon the agency record denied.]

Dated: July 25, 2006

Steptoe & Johnson LLP (Richard O. Cunningham, Joel D. Kaufman, Alice A. Kipel, and Jamie B. Beaber) for the plaintiff.

Peter D. Keisler, Assistant Attorney General; Claudia Burke, Attorney; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jeanne E. Davidson), for the defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and Ellen J. Schneider) for defendant-intervenor United States Steel Corporation.

Restani, Chief Judge: This matter is before the court on plaintiff Corus Staal BV's

("Corus") motion for judgment on the agency record pursuant to United States Court of

International Trade Rule 56.2.  At issue are certain portions of the final results of the second administrative review of an antidumping duty order by the International Trade Administration of the United States Department of Commerce ("Commerce" or "Department") of hot-rolled steel from the Netherlands.  See Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands, 70 Fed. Reg. 18,366 (Dep't Commerce Apr. 11, 2005) (second admin. rev.) [hereinafter Final Results] (covering the period from November 1, 2002 through October 31, 2003).

Corus claims that (1) the agency's use of the "zeroing" methodology is contrary to law, (2) the agency's classification of Corus' "just-in-time" ("JIT") sales to an unaffiliated U.S. customer as constructed export price ("CEP") transactions (rather than export price ("EP") transactions) is contrary to law and unsupported by substantial evidence and (3) the agency's determination that Corus absorbed duties related to sales of the subject merchandise is contrary to law and unsupported by substantial evidence.  Corus claims that zeroing, whereby transactions in which the U.S. price exceeds normal value ("NV") – i.e., nondumped sales – are set to zero in calculating Corus' weighted average dumping margin (and concomitant assessment rate and deposit rate), does not properly allow non-dumped sales to offset dumped sales, resulting in a higher margin, assessment rate and deposit rate than the mathematical average of margins for the subject merchandise as a whole.

As to the first issue, notwithstanding the decisions by this court and the Court of Appeals for the Federal Circuit holding that zeroing is permitted, Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004); Corus Staal BV v. U.S. Dep't of Commerce ("Corus I"), 259 F. Supp. 2d 1253, 1261 (CIT 2003), aff'd, 395 F.3d 1343 (Fed. Cir. 2005); Corus Staal BV v.

United States ("Corus II"), 387 F. Supp. 2d 1291, 1297 (CIT 2005), aff'd, Slip Op. 05-1600,

2006 U.S. App. LEXIS 15022 (Fed. Cir. June 13, 2006), Corus claims that structural changes to

the U.S. antidumping statute, as well as recent decisions by World Trade Organization ("WTO")

and North American Free Trade Agreement ("NAFTA") panels, suggest that Commerce's

continued use of zeroing is no longer reasonable.

As to the second issue, Corus claims that the agency's classification of Corus' JIT

sales to an unaffiliated U.S. customer as CEP transactions (instead of EP transactions) is

erroneous because Commerce incorrectly identified the first sale or agreement to sell as Corus'

post-importation issuance of the final invoice for the JIT transactions.  Under 19 U.S.C. §

1677a(a) and (b) (2000), post-importation sales and agreements to sell are classified as CEP

transactions.  Corus argues that the first agreement to sell should instead be defined loosely as an

agreement between two parties to enter into a binding contract, which Corus claims occurred

prior to the date of importation, when Corus entered into a frame agreement with JIT customers

in the Netherlands, or alternatively when Corus later issued a pro forma invoice at the time the

JIT merchandise was shipped to the United States.  Corus therefore contends that the JIT sales

fulfill the statutory definition of an EP transaction under § 1677a(a) .

As to the final issue, Corus claims that the agency's determination of duty

absorption is contrary to law and unsupported by substantial evidence, asserting that the duty

absorption statute, 19 U.S.C. § 1675(a)(4), does not apply when Corus itself, and not a U.S.

affiliate, is the importer of record.  Additionally, Corus argues that Commerce has in practice

turned duty absorption into an unlawful de facto irrebuttable presumption and lacks sufficient

evidence to prove duty absorption actually occurred in this case.

In response to plaintiff's motion, both Commerce and United States Steel Corporation ("U.S. Steel"), the defendant-intervenor and petitioner in the original investigation, argue that Corus' motion, with respect to zeroing, should be denied because the final results are in accordance with the law. Commerce, citing decisions by this court and the Federal Circuit, both of which have repeatedly sustained Commerce's methodology, asserts: (1) use of zeroing is "reasonable" because it has been definitively upheld by binding precedent; and (2) the WTO and NAFTA decisions cited by Corus are legally irrelevant, for numerous reasons. U.S. Steel agrees with Commerce that the Department's use of zeroing is proper, and that Corus' reliance on WTO and NAFTA decisions is misplaced, but also asserts that zeroing is not merely in accordance with the law but is actually required by law.

As to the second issue, Commerce argues that the classification of the JIT sales as CEP transactions is supported by substantial evidence and in accordance with the law. In the Issues and Decision Memorandum, Commerce concluded that a sale occurs when there is "both a 'transfer of ownership to an unrelated party and consideration,'" which Commerce contends did not occur until Corus' issuance of the final invoice after importation. Issues and Decision Mem. for the 2002-2003 Administrative Review of Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands; Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 18366 (Dep't Commerce Apr. 4, 2005) (final determ.), at 9 [hereinafter "Issues and Decision Mem."] (citing AK Steel Corp. v. United States, 226 F.3d 1361, 1371 (Fed. Cir. 2000)). Although Commerce originally did not distinguish a sale from an agreement to sell or respond specifically

to Corus' contention that an agreement to sell existed prior to importation, Commerce now contends that an agreement to sell occurs when the importer and purchaser have settled upon the price and quantity terms for the sale. U.S. Steel agrees with Commerce that no sale or agreement to sell occurred prior to importation here because price and quantity were not fixed until the final invoice. Therefore, they argue that under 19 U.S.C. § 1677a(a) and (b), the JIT sales should be classified as CEP transactions.

As to the final issue, Commerce argues that Corus failed to exhaust its administrative remedies by failing to challenge Commerce's preliminary duty absorption determination and therefore ought to be precluded from making the challenge now. Additionally, Commerce contends that even if Corus had exhausted its administrative remedies and may make a valid challenge, the challenge should be rejected because the duty absorption statute applies even when Corus itself, and not a U.S. affiliate, is the importer of record. U.S. Steel agrees with Commerce that there is no closer "affiliate" relationship to an exporter than the exporter itself, and therefore Corus, according to 19 U.S.C. § 1675(a)(4), is subject to the duty absorption determination.

### JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2000). In reviewing one of Commerce's administrative determinations made under 19 U.S.C. § 1673d, the court will uphold the challenged determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.      Commerce's Use of Zeroing is Reasonable and in Accordance With Law**

Numerous cases before this court and the Federal Circuit have held that "zeroing" is neither required nor prohibited by 19 U.S.C. § 1677(35)(A), (B), in either an investigation, see, e.g., Corus I, 259 F. Supp. 2d at 1261, or an administrative review, see, e.g., Timken, 354 F.3d at 1341-42; Corus II, 387 F. Supp. 2d at 1297.  Applying Chevron, both this Court and the Federal Circuit defer to Commerce's interpretation as a reasonable interpretation of statutory language. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); Timken, 354 F.3d at 1342-43.

Despite these prior holdings, Corus claims that previous structural changes to the U.S. antidumping statute, as well as recent WTO decisions, suggest that Commerce's continued use of zeroing is no longer reasonable.  As this court has previously noted, however, the Federal Circuit has "(1) expressly affirmed the reasonableness of Commerce's use of zeroing in an antidumping administrative review, and . . . (2) conclude[d] that WTO decisions are not binding on the U.S. and cannot trump domestic legislation."  Corus II, 387 F. Supp. 2d at 1298.

The court has carefully considered all of Corus' arguments and finds no reason to depart from its own prior decisions or those of the Federal Circuit.  Further, the court has considered U.S. Steel's argument that zeroing is mandatory under the statute.  The court does not reach that argument as this court's prior holdings that Commerce's practice is permissible are sufficient to sustain the determination in this regard.

**II.     Commerce's Decision to Classify Corus' JIT Transactions as CEP Transactions rather than EP Transactions is Reasonable**

In calculating dumping margins, Commerce compares the U.S. Price to the NV of

the subject merchandise and imposes antidumping duties if, and to the extent, the former is lower

than the latter.  See 19 U.S.C. § 1673.  The U.S. Price is calculated using either the EP or CEP

methodology.  Adjustments are made in both cases, but if the sale is classified as a CEP sale,

additional deductions are made from the sales price to arrive at the U.S. Price.[1]  The statute

defines EP and CEP as follows:

> (a) Export Price
> The term "export price" means the price at which the subject merchandise is first
> sold (or agreed to be sold) before the date of importation by the producer or
> exporter of the subject merchandise outside of the United States to an unaffiliated
> purchaser in the United States or to an unaffiliated purchaser for exportation to the
> United States . . . .
>
> (b) Constructed Export Price
> The term "constructed export price" means the price at which the subject
> merchandise is first sold (or agreed to be sold) in the United States before or after
> the date of importation by or for the account of the producer or exporter of such
> merchandise or by a seller affiliated with the producer or exporter . . . .

19 U.S.C. § 1677a(a)-(b).

The U.S. Price classification issue in this case involves Corus' direct sale of

_____

[1] Due to these deductions, the use of CEP is more likely to result in a determination of
dumping.  Specifically, the deductions include any expenses from the sale of the subject
merchandise (e.g., credit expenses), the cost of further manufacture, and the profit allocated to
those costs and expenses.  See 19 U.S.C. § 1677a(d).  As the Federal Circuit stated in AK Steel,
the U.S. Price "is meant to be the sales price of an arm's-length transaction between the foreign
producer and an unaffiliated U.S. purchaser."  AK Steel, 226 F.3d at 1367.  The deductions
therefore are meant "to prevent foreign producers from competing unfairly in the United States
market by inflating the U.S. Price with amounts spent by the U.S. affiliate [or in this case, Corus
itself] on marketing and selling the products in the United States."  Id.

subject merchandise to an unaffiliated U.S. customer.  Corus' sales process for its JIT

transactions makes use of frame agreements, pro forma invoices, and sales invoices.  According

to Corus, the frame agreements set forth a general framework outlining the estimated volume and

pricing of the customer's likely purchases.  Corus' Resp. to Section A of the Department's

Antidumping Duty Questionnaire (Feb. 18, 2004) ("Section A Resp.") at A-66.  The frame

agreements were not signed by the JIT customer, Verification Report of Corus Steel USA (July

13, 2004) ("Verification Report") at 5, and were not binding on either party.  Corus' Resp. to the

Department's Second Section A Supplemental Questionnaire (May 13, 2004) ("May 13, 2004

Resp.") at 5, P.R. 29.  When merchandise was shipped to the United States, Corus issued a pro

forma invoice detailing the imported items for U.S. customs purposes.  See Corus' Resp. to the

Department's Second Section C Supplemental Questionnaire (June 24, 2004) ("June 24, 2004

Resp.") at Ex. C-39 (showing that the pro forma invoices bore the legend "INVOICE FOR

CUSTOMS PURPOSES").[2]

The merchandise in question was shipped to and stored at a warehouse in the

United States to await an order from the U.S. customer.  To purchase the merchandise, Corus'

U.S. customer issued purchase orders.  For each purchase order received, Corus performed a

price calculation based on both the quantity ordered and the prevalent market situation.  Section

A Resp. at A-67.  Once the price was finalized and agreed upon, Corus issued the sales invoice

---

[2] In certain circumstances, the merchandise was shipped, and the pro forma invoice issued, over a year before the date of the applicable frame agreement.  A comparison of the June 24, 2004 Resp. at Ex. C-39, with Corus' Resp. to the Department's Section A Supplemental Questionnaire (Apr. 1, 2004) ("Apr. 1, 2004 Resp.") at Ex. A-27 shows that the frame agreement was dated January 10, 2003, and the pro forma invoice was issued and the merchandise shipped to the U.S. in September 2001, nearly eighteen months earlier.

setting forth the fixed terms of the sale, namely the product sold, quantity, and price, and directed

that the merchandise be shipped from the warehouse to the customer. Section A Resp. at A-67.

Upon receipt of the merchandise, the customer remitted payment to CSUSA, Corus' U.S.

affiliate. Verification Report at 5-6.

The parties do not dispute that where a sale or agreement to sell between a foreign

exporter and an unaffiliated U.S. customer occurs after importation in the United States, that

CEP methodology is to be used.[3] What is disputed is the point at which a sale or agreement to

sell first occurred in order to determine if EP methodology should have been used instead. Corus

claims that the agency's classification of Corus' JIT sales to the unaffiliated U.S. customer as

CEP transactions is erroneous because Commerce incorrectly identified the first sale or

agreement to sell as Corus' post-importation issuance of the final invoice for the JIT transactions.

Defining an agreement to sell as a loose agreement between two parties to enter into a binding

contract, Corus argues that an agreement to sell occurred when it entered into a frame agreement

in the Netherlands with JIT customers, or, alternatively, when Corus later issued a pro forma

invoice at the time the JIT merchandise was shipped to the United States. Corus claims that

Commerce, in both the investigation and first administrative review of this case, determined that

Corus' frame agreements memorialized an agreement to sell and ultimately governed on the

---

[3] Generally, Commerce applies CEP methodology "when the foreign producer's or exporter's steel is sold to an unaffiliated U.S. buyer by a producer-affiliated company located in the United States." AK Steel, 226 F.3d at 1364. Commerce applies EP methodology to a sale "when the foreign producer or exporter sells merchandise directly to an unrelated purchaser located in the United States." Id. However, "the statute appears to allow for a sale made by a foreign exporter or producer [directly to an unrelated U.S. purchaser] to be classified as a CEP sale, if such a sale is made 'in the United States.'" Id. at 1367 n.5 (quoting 19 U.S.C. § 1677a(a)).

question of EP versus CEP. Thus, Corus argues, the frame agreement between Corus and its

U.S. JIT customer, which was executed in the Netherlands before importation, is determinative

of when an agreement to sell occurred.

Commerce defines a sale or agreement to sell as the point at which the material

terms of the agreement, i.e., price and quantity, have been established between the foreign

producer/exporter and the customer.[4] In this case, neither the frame agreements nor the pro

forma invoices settled these terms. Instead, the frame agreements and pro forma invoices

provided estimated prices and quantities or left these terms to be determined at final invoicing.

Commerce thus argues that, the final invoices, not the frame agreements, in this case are

controlling for the purposes of EP/CEP classification.[5] Commerce distinguishes the frame

---

[4] Commerce found that

[t]here was no sale between Corus and the JIT customer before importation, because there was no agreement on the material terms (i.e. price and quantity) until the final invoice was issued after importation of the subject merchandise. Here, the sale does not take place until the final invoice is issued, when the goods are in the United States."

Issues and Decision Mem. at 10.

[5]As Commerce explained in its Preliminary Results,

Corus Staal argues that the frame agreement is controlling in this case based upon the Department's position in the investigation. However, in this review, Corus Staal has maintained the invoice date "better reflects the time that the material terms of sale become fixed" . . . . In Corus Staal's own words, the invoice date is the date used to determine the date of sale as changes often do occur between the frame agreement and the date of invoice. If this is the case, it is hard to argue that the frame agreement is the governing document in determining when a sale is agreed upon or when it is executed.

Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands; Prelim. Results of

agreements here from the frame agreements of the original investigation, arguing that, unlike in

the case at hand, the frame agreements in the original investigation were determinative because

they provided the final written confirmation of the sales agreement and set forth the agreed-upon

prices and quantities.[6]  See Notice of Prelim. Determination of Sales at Less Than Fair Value;

Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands, 66 Fed. Reg. 22,146,

22,149 (May 3, 2001) ("Specifically, although Corus Staal initially reaches the agreement with

the U.S. customer on the estimated overall volume and pricing of merchandise, CSUSA provides

the final written confirmation of the agreement, setting forth the agreed prices and quantities, to

the U.S. customer.") (emphasis added).

Under Chevron, the issue before the court is whether the meaning of the statute is

clear from the face of the statute.  Chevron, 467 U.S. at 842-43.  If so, the agency is required to

give effect to the express statutory language.  Where the statute is silent or ambiguous, the

question for the court is whether the agency's answer is a permissible construction of the statute.

Id.

Here, Commerce's definition of "sold (or agreed to be sold)" comports with a

_____

Antidumping Duty Administrative Review, 69 Fed. Reg. 70,226, 70,229 (Dec. 3, 2004) (internal
citations omitted) [hereinafter Prelim. Results].

[6] Commerce is free to change its position on frame agreements from the investigation in
the previous review because it has fully explained its reasoning for doing so.  See Viraj Forgings,
Ltd. v. United States, 350 F. Supp. 2d 1316, 1324 (CIT 2004) ("Commerce need not 'forever
hew' to its prior decisions, but it must explain with specificity the reason for its departure from a
prior practice.") (quoting Viraj Forgings, Ltd. v. United States, 283 F. Supp. 2d 1335, 1342 (CIT
2003)).  In fact, Commerce attempted to revisit this issue after the first review was complete, but
the court did not permit it.  See Corus II, 387 F. Supp. 2d at 1295-96.  Whether the facts were
different in the first review is unknown because Commerce never explored the concept of
agreement to sell.  Id. at 1296.

plain reading of the statute, which specifically states that both EP and CEP classifications hinge

upon "the price at which the subject merchandise is first sold (or agreed to be sold) . . . ." See 19

U.S.C. § 1677a(a) and (b) (emphasis added).  It follows that the classifications could not

realistically hinge upon a price that has not been fixed with some certainty by the time of the sale

or agreement to sell.  Although the statutes do not specifically define the term "sold (or agreed to

be sold)," when a word is undefined in a statute, the agency and the reviewing court normally

give the undefined term its ordinary meaning.   AK Steel, 226 F.3d at 1371 (citing Perrin v.

United States, 444 U.S. 37, 42 (1979)) ("A fundamental canon of statutory construction is that,

unless otherwise defined, words will be interpreted as taking their ordinary, contemporary,

common meaning.").  Based on the plain definition of "sale" stated in Webster's New

International Dictionary 356 (1932), the Federal Circuit in NSK Ltd. v. United States

unequivocally defined "sold" to "require both a 'transfer of ownership to an unrelated party and

consideration.'" AK Steel, 226 F.3d at 1371 (quoting NSK Ltd. v. United States, 115 F.3d 965,

975 (Fed. Cir. 1997)) (emphasis added).  Similarly, we look to the plain meaning of the term

"agree," which is defined in Webster's Ninth New Collegiate Dictionary 43 (9th ed. 1990) as

"(1) admit; concede; (2) to settle by common consent."  Therefore, if a foreign producer or

exporter has sold or agreed to sell merchandise to an unaffiliated U.S. customer, the two parties

must have settled upon the terms of the transfer of ownership and the terms of the consideration

for that transfer.  In other words, in order for a sale or agreement to sell to have occurred, the

parties must have settled upon the price and quantity involved in the transaction with complete or

at least near certainty.[7]  As there is no real ambiguity about these terms, we are not required to

analyze the issue under the second part of the Chevron test.

Turning to the application of the law to the facts of this case, Commerce properly

applied the definition of "sold (or agreed to be sold)" to the case at hand.  As the material terms

of the sale or agreement to sell were not fixed until the final invoice, Commerce could properly

conclude that the final invoices determined when a sale or agreement to sell first occurred.[8]  It

follows that the sale or agreement to sell occurred after importation in the United States.

Therefore, Commerce correctly classified the JIT transactions as CEP transactions pursuant to 19

---

[7] In its Reply Brief, Corus argues that Commerce has defined sale and agreement to sell in exactly the same way, impermissibly reading the "agreed to be sold" requirement out of the statute.  Commerce, in its Response Brief, stated that an agreement to sell does not occur until the material terms of the sale are fixed, which Corus argues is the same as the Department's test to determine when a sale takes place for date of sale purposes.  Corus claims that Commerce ignores the plain language of the statute in making this interpretation, as well as violates AK Steel, which Corus claims held the locus and identity of the seller (and not whether material terms are fixed) to be the controlling factors of distinguishing between EP and CEP sales.

Corus, however, incorrectly assumes that "sale" and "agreement" to sell are being defined identically.  While both a sale and an agreement to sell require the establishment of the material terms of sale, other factors may additionally distinguish the two terms.  In this particular instance, the time of sale and agreement to sell happen to coincide.

Additionally, Corus is wrong in its characterization of AK Steel.  AK Steel did not say that the locus and identity of the seller are the sole controlling factors for the purpose of EP/CEP classifications; rather, AK Steel held that the locus of the transaction at issue (i.e., where the sale takes place, not the location of the company) and whether the foreign producer or exporter and the U.S. importer are affiliated are "two factors dispositive of the choice between the two classifications."  AK Steel, 226 F.3d at 1369.  By emphasizing the material terms of the sale, Commerce seeks to define the terms "sale" and "agreement to sell," a necessary step to determining the first factor in deciding upon EP or CEP status, as noted in AK Steel.

[8] As Corus stated: "[A]t the time [the frame agreements] are executed, there is no binding final agreement as to price, quantity or even specific products to be shipped.  Rather, they provide an operating framework under which the customer and Corus can plan their business operations."  May 13, 2004 Resp. at 5.

U.S.C. § 1677a(a) and (b).

**III.     Corus Failed to Exhaust its Administrative Remedies as to Commerce's Determination of Duty Absorption**

Corus' challenge to Commerce's duty absorption determination is precluded from review because, by failing to challenge Commerce's preliminary duty absorption determination, Corus failed to exhaust its administrative remedies.

Congress expressly directs that this Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This Court has "generally take[n] a strict view of the need [for parties] to exhaust [their] remedies by raising all arguments" in a timely fashion so that they may be appropriately addressed by the agency. Pohang Iron & Steel Co. v. United States, 23 CIT 778, 792 (1999). In an antidumping case such as this, where "Congress has prescribed a clear, step-by-step process for a claimant to follow, and the failure to do so precludes [the claimant] from obtaining review of that issue in the Court of International Trade." JCM, Ltd. v. United States, 210 F.3d 1357, 1359 (Fed.Cir. 2000) (citing Sandvik Steel Co. v. United States, 164 F.3d 596, 599-600 (Fed. Cir. 1998)). The doctrine of exhaustion serves two basic purposes: to protect administrative agency authority and to promote judicial efficiency. Ta Chen Stainless Steel Pipe, Ltd., v. United States, 342 F. Supp. 2d 1191, 1206 (CIT 2004).

It is undisputed that the Commerce Department's Preliminary Results included a specific finding that Corus had unlawfully absorbed duties. See Prelim. Results, 69 Fed. Reg. at 70,228. It is also undisputed that Corus failed to challenge that finding in the case brief that it filed with the Commerce Department following the issuance of the Preliminary Results, and that

Corus briefed the issue for the first time only after Commerce issued the Final Results in the

Rule 56.2 Motion now before the Court.[9]  Hence, Commerce was not put on timely notice of the

company's objection following the issuance of the Preliminary Results and could not revisit the

duty absorption issue in the Final Results.  In Ta Chen, the court stated:

> The prescribed remedy for challenging Preliminary Results issued by the
> Commerce Department is to file a case brief with the agency setting forth
> objections. By regulation, the Department affords interested parties the
> opportunity to submit such briefs within 30 days after Preliminary Results
> are published. The regulations specifically require that such briefs "present
> all arguments . . . relevant to the Secretary's . . . final results, including any
> arguments presented before the date of publication of the . . . preliminary
> results."

Ta Chen, 342 F. Supp. 2d at 1205 (quoting 19 C.F.R. § 351.309(c)(1)-(2)) (emphasis and
omissions in the original).

As in Ta Chen, by failing to raise the duty absorption claim immediately after the

issuance of the Preliminary Results, Corus did not present all arguments relevant to Commerce's

Final Results and essentially precluded Commerce from the opportunity to make a final

determination on the issue.  Corus' actions directly contravene the policy behind the exhaustion

doctrine.  While it might be theoretically possible for Commerce to address the issue later, the

agency is under no obligation to do so.  Id. at 1206 (citing McKart v. United States, 395 U.S.

---

[9] Corus contends that it raised the duty absorption determination challenge before the
Preliminary Results were even issued, arguing that the challenge was presented to Commerce in
Corus' Resp. to Commerce's Request for Information with Respect to Duty Absorption (Mar. 5,
2004) and that Commerce subsequently responded to the challenge in its Preliminary Results.
However, this mischaracterizes the nature of Corus' preliminary "challenge," which was not the
formal raising of a claim against a duty absorption determination, but merely a response to
Commerce's request for information during its duty absorption review, made before any
determination as to duty absorption had even been reached.

185, 195 (1969)).  As in <u>Ta Chen</u>, Corus should have addressed the issue in its case brief

immediately after Commerce's preliminary determination.  By failing to do so, Corus waived its

right to bring up the claim later.[10]

       In certain cases, when mandating administrative exhaustion would prove "futile or

an insistence on a useless formality," the court has waived the requirement.  <u>Alhambra Foundry</u>

<u>Co. v. United States</u>, 12 CIT 343, 347, 685 F. Supp. 1252, 1256 (1988).   The issue raised by

_____

[10] Even if Corus had exhausted its administrative remedies and was permitted to make a challenge now, the statutory construction challenge likely would be rejected because Commerce's interpretation of "affiliated" to include exporters importing through themselves has been found to be a permissible construction. <u>See</u> <u>Agro Dutch Indus., Ltd. v. United States</u>, Slip. Op. 06-40, 2006 WL 785463 at 13 (CIT Mar. 28, 2006).  The court stated:

> Commerce's interpretation of subsection 1675(a)(4) appears to be a reasonable, common-sense solution to what Congress attempted to accomplish with its enactment. This conclusion is inherent from the statute's focus-upon duty absorption in the foreign producer or exporter-and therefore even if the meaning of "affiliate" were clear, and resort to legislative history unnecessary, to find that the statute does not address the circumstance of the foreign producer or exporter itself acting as the importer of record would result in an apparent absurdity."

<u>Id.</u> at 14. Thus, this is also not an issue that cries out for court resolution because an obvious error has been committed.  "Affiliation" requires definition because issues of control are often unclear.  Here, where the "affiliated" parties are the same entity, no definition is needed.  There is no question as to how close the relationship is or what level of control is involved.  Therefore it is unlikely that plaintiff would prevail, in any case.

Corus in this case, however, fails to meet these criteria.[11]

_____

[11] Scenarios in which the court waives administrative exhaustion requirements include when: (1) plaintiff raised a new argument that was purely legal and required no further agency involvement; (2) plaintiff did not have timely access to the confidential record; (3) a judicial interpretation intervened since the remand proceeding, changing the agency result; (4) it would have been futile for plaintiff to have raised its argument at the administrative level. Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991). None of the established exceptions to the doctrine of exhaustion are relevant here. In particular, Corus' claim does not raise a purely legal question. See Hercules, Inc. v. United States, 11 CIT 710, 735 (1987) ("[W]here a new claim is asserted outside of the administrative record by a party who participated in the administrative proceeding, and the claim is purely legal and does not add factual data to the record, it is within the Court's discretion to consider the claim."). In order to qualify for the exception, plaintiff must (1) raise a new argument; (b) this argument must be of purely legal nature; (c) the inquiry shall require neither further agency involvement nor additional fact finding or opening up the record; and (d) the inquiry shall neither create undue delay nor cause expenditure of scarce party time and resources. Consolidated Bearings Co. v. United States, 25 CIT 546, 587 (2001), rev'd on other grounds, 348 F.3d 997 (Fed. Cir. 2003).

In asking the court to vacate Commerce's finding of duty absorption, Corus objects not only to Commerce's statutory construction of 19 U.S.C. § 1675(a)(4), but additionally argues that Commerce lacks sufficient evidence to prove duty absorption by Corus and that Commerce has in practice turned the duty absorption determination into a de facto irrebuttable presumption by virtue of its application in that manner for almost ten years. These allegations require an evidentiary assessment of duty absorption by the court, a factual record of Commerce's past practices and an assessment of Commerce's justifications for those practices. As in Consolidated Bearings Co., 348 F.3d at 1003, "[s]tatutory construction alone is not sufficient to resolve this case." See Id. (holding that the case did not present a purely legal question because one of cross-appellant's arguments concerned divergence from past administrative practice). Accordingly, this case does not qualify for the "pure" question of law exception to the exhaustion doctrine. Cf. Agro Dutch Indus., Slip. Op. 06-40, 2006 WL 785463 at 12 (holding that a "pure" question of law exception to the exhaustion doctrine did apply to a 19 U.S.C. § 1675(a)(4) statutory construction claim that was added to a pre-existing duty absorption challenge in which all factual arguments had already been raised in plaintiff's administrative case brief ).

## **CONCLUSION**

For the foregoing reasons, Corus' Motion for Judgment on the Agency Record is denied,

and Commerce's Final Results are sustained.

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated this 25th day of July, 2006.
New York, New York.